Good afternoon. Robin Conrad on behalf of Mr. Moorman and Mr. Towery. We are here today on appeal from the District Court's denial of their motion for preliminary injunction. Mr. Moorman and Mr. Towery filed their motion after the Arizona Department of Corrections changed its lethal injection protocol for the seventh time since 2007, after their execution dates had been set. And as you know, as of today, the Department has given notice that it will be using a one-drug protocol to carry out the executions of Mr. Moorman and Mr. Towery. Once again, we're here because the Arizona Department of Corrections has made last minute changes to their protocol and issued a decision on December 21st. A month later, the Department changed its protocol again. Mr. Moorman and Mr. Towery recognize that a preliminary injunction is an extraordinary remedy, but this Court must balance the competing claims of injury and must consider the effect on each party of the defendant. Mr. Moorman and Mr. Towery are asking this Court to stay their execution, and this Court should consider whether the claim could have been brought sooner so that full review of the merits could be determined. The change to the protocol, which plaintiffs Moorman and Towery would argue isn't necessarily a change to the protocol, but a decision made this morning hastily and only because the protocol was not followed. Under the equal protection claim that Mr. Moorman and Mr. Towery have raised, this Court needs to look at the government action and determine whether these prisoners who are Here, it's not whether there's a rational basis for the underlying action, but whether there's a rational basis to treat one prisoner differently than another. Today's action... Counsel, for a class of one or similar equal protection theory to apply or any equal protection theory to apply, there has to be something detrimental happening, no? In other words, treating two people differently, giving somebody a red hat and somebody a blue hat is not an equal protection violation, is it? Well, the equal protection violation here, we've argued, is two levels. One is an equal protection violation where the fundamental rights of the prisoners are being burdened by the face of this protocol. I understand that. And then there's a second. All right. But I thought you were talking about the second one now. Yes. And the second one is that government action that infringes and treats other people who are similarly situated differently, there has to be a rational Even if there's no detriment? In other words, the premise here would have to be that you've already lost on the Eighth Amendment claim. And not only that, with regard to the drug protocol, you've been preferring the one drug protocol all along. So how, without some detriment, not necessarily a detriment based on a fundamental right or a detriment based on a suspect class, but a detriment, can you have an equal protection violation? The equal protection violation lies with the fact that there has to be, for government action, some rational basis and some standard for making these determinations. And here we don't have that. The Arizona Department of Corrections has to provide to similarly situated prisoners a rational basis for the decision for deciding they're going to apply one protocol to one prisoner and a different protocol to another prisoner. Let me step back. If each protocol, just for hypothetical purposes, if each protocol is independently constitutionally sufficient, what is the equal First of all, we don't know that the three drug protocol is constitutional. I ask you to assume that both protocols are constitutional. If that is presumed, then is there an equal protection violation? There is without a rational basis for picking one over the other. There has to be transparency in reliability on the director's determination to make this decision. There has to be some reason, a rational reason, for picking X over Y or A over B for each prisoner who is similarly situated. If there's no detriment, and one of the rationales is the state wants to have some flexibility, and leaving aside whether it can do it as it's done here in this as long as there's not a constitutional violation or some detriment to them. Not everybody's entitled to non-constitutional equal treatment. So why, if they're doing it to give themselves some flexibility, and particularly in the case of what drugs are available, would you need more than that as a would be acceptable if there was, in the protocol, the determination of how those decisions would be made? Here we have the director not following the protocol, which under the protocol, they were supposed to check upon issuance of a warrant if the drugs were available. But that's a different issue. I mean, as to, that's not an equal protection argument, as I understand it. I'm not sure what you mean, Judge Bergeron, that that's not an equal protection argument. Well, as I understand it, you had a facial challenge to this protocol because of the discretion accorded as being an equal protection violation without regard to, A, whether there was any constitutional violation, but, B, whether there was even any non-constitutional detriment to anybody. And that's the part I'm having a very hard time with. Why it should be an equal protection, it's almost a standing problem. If the person is not being harmed, and in this instance, you've been preferring the one-drug protocol. Now you have the one-drug protocol. How are you being harmed? What's the detriment that gives rise to the fact that you're treating one person worse than another, and therefore there's an equal protection violation, leaving aside whether anything unconstitutional is happening? Part of the problem is, again, that there's no reasoned decision on the face of this protocol that tells the director whether to make decision A or decision B to prisoner A or prisoner B. And the action here in this case in deciding, or it's probably not even accurate to say a decision, it was they discovered this morning that the drug that they had and thought was available was expired. And had they followed their protocol as prisoners who are going to be executed would assume that they were going to do, they should not have made that decision and given notice that a three-drug protocol would have been used. Let me shift you to the facial challenge, if I might, and ask you, on the facial challenge, assuming they are now going forward with what counsel in this litigation and others has, without choosing, as indicated is the preferred option, the one-drug option, which of the specific facial infirmity challenges, in your view, also apply to the one-drug protocol that we ought to take a look at? Is anything mooted or is everything still on the table? The other issues of discretion are the peripheral versus femoral line, the medically trained individual versus an appropriately trained individual. So the director selecting the people who are going to participate in the execution. And those are the two issues that are still valid. But leaving aside the protection way of looking at this, what about just the direct Eighth Amendment way of looking at it? And in response to the Eighth Amendment challenge, are you saying that peripheral versus femoral and the medical personnel are the Eighth Amendment challenges that we should still consider? Correct. As a facial challenge. Yes. The plaintiffs obviously can see that if, in fact, they do use a one-drug protocol, which they've given notice today, but that doesn't mean they will come up with something tomorrow and go back to the free drug if they do acquire the pancuronium bromide between today and Mr. Mormon's scheduled execution. But there are still risks, Eighth Amendment risks, from using unqualified personnel that's a facial challenge on the protocol and the pain related to the use of a femoral line versus a peripheral line. So those are still Eighth Amendment violations that are before this Court. What about you had raised, and I understood you still to be raising, the fact that there doesn't seem to be redundancy in this protocol, as was stressed in Bayes, for example. And in particular, although you didn't specifically note it, you did say that there was no requirement of a backup system. And in response to which, the district judge quoted one sentence, which still seems to regard it. But looking at the protocol, it seems to me that there's no longer any requirement of there being any backup set of drugs. So therefore, there doesn't seem to be any backup system. Are you still raising that issue? Yes, Judge Berzon. We would. And we do disagree with the district court's finding that backup. You said you did raise it. My question is, did you raise it? Where in your brief to this Court did you raise that as an issue, just so I know where I'm looking? I'll have to check the brief and get back with you on that. Okay. Why don't we wait until you reply and you can point to us on that, but you can keep making your argument. Okay. So, Your Honors, we would argue that there is obviously the change in the protocol going to a one drug does get rid of the issues that rise to the Eighth Amendment violation from a second and third drug, if in fact that is used. There are still – Let me just ask you a question. What issues would there be? And this is something I don't understand at all. If the one drug and the quantity being used is sufficient for the execution, and that seems to be the premise of Arizona and one that you don't seem to be taking any quarrel with, then the other two drugs are just unnecessary and what difference do they make, even if they're given? So, in other words, you're saying the first drug would result in death of the prisoner, regardless? Yes. Right. That is – I would not disagree with that statement at all, and I think there's expert testimony that agrees with that as well. Well, if that's true, then all of the – A, I don't know why Arizona wants to do it, and B, I don't know why you're complaining about the three drugs. Well, the reason why the three-drug protocol is problematic is because of the risk of maladministration of the first drug. I mean, that was the whole issue in Bayes, and whether the risks are substantial enough and whether there are – Yes, because there they were not – they were giving a proportion. I mean, I suppose they could give a mistaken proportion. I guess that's possible. But the amount they're now giving is not going to – apparently isn't going to lead to those problems if they actually give that amount. And that makes the assumption that the first drug that's being given is the barbiturate, which there are concerns with whether there could be a mix-up in the drugs, if the paralytic is the first. Well, no, no, wait. Let's – you can't – we can't go there. I mean, that kind of speculation can't support an injunction. So if you take Judge Barzon's premise that the first one would be sufficient, what is the argument then? I mean, if it's effective and it works, then where does that leave you legally? Are we talking about the proposed one-drug protocol, or are you still referring back to a possible three-drug protocol? You could address both, just so we can understand the differences in your view. So the issue with the one-drug protocol, from an Eighth Amendment standard, with the drug itself, obviously, we don't have any concerns that would be attendant with the second and third drug. If the drug is properly administered and the IVs are set by qualified individuals that are properly trained, medically trained individuals, then the risk of maladministration and the risk of harm is obviously very slight. Between the difference between a one-drug and a three-drug, the three-drug protocol, again, it introduces unnecessary risk. They've shown that they have a one-drug available. There's absolutely no rational basis for picking one over the other when the risks are increased. Well, I suppose that the one thing that can go wrong with the one-drug protocol is that there could not, in fact, be enough of it, or it could not be what it says it is, right? So, in other words, it's not necessarily that it's going to cause pain, but it's going to cause this person not to, in fact, be executed at the end of the administration of the drug. And if that were the case, would there be an Eighth Amendment problem? This gets back to my redundancy concern. But suppose, you know, at the end of the administration of the one drug, it turns out that it wasn't really what it was supposed to be, or it wasn't effective, or there wasn't enough of it, and, in fact, he's still alive. Well, and that could be a concern, and that's a concern that we've raised previously about drugs that are imported and don't have the FDA approval because there's no guarantee that they are what they purport to be. So in and of themselves, there's a risk involved in using a drug that doesn't have the approval. But does Bayes and the following cases only recognize an Eighth Amendment problem if there's serious pain, or is there other – sometimes the words use a serious pain, and sometimes the words use a serious harm. And the question is, can there be serious harm that's not serious pain? We would argue that there are – there would be in the Eighth Amendment context. And Bayes clearly – clearly involved the administration of a three-drug protocol. And so Bayes was looking at whether there are a serious risk of substantial pain and suffering to the prisoner. There can be other situations where the Eighth Amendment will be violated, and objectively intolerable risk of harm for which the Department of Corrections cannot be subjectively blameless. And that's a standard that Bayes also adopted as well. Could you give us an example of that with the one-drug protocol so we could understand what would be the other application? So an objectively intolerable risk of harm where the Department of Corrections could not be subjectively blameless is if they knew that the drugs that they had were not as safe, they were warned, which in this case they had warnings before importing sodium thiopental, and they went ahead and gave those drugs to the prisoner anyways, which happened. Let me ask you here, as I read your brief, the district court dealt with the three-versus-one challenge and also the equal protection, and he also dealt with this importation of drugs. But other than in the equal protection challenge, I didn't see your appeal to this court to be to the fact that there might be an importation issue. Did I read your brief correctly? Well, yes, Judge, and also the... Well, answer yes or no. Did I read it correctly that you didn't make an importation challenge on appeal? Yes. Okay. As to the Eighth Amendment, I believe that is correct. And in part now, this is based on the Department of Corrections' representations to us that they were using the pentobarbital that is a domestic drug, and now obviously the imported drug that they're using they aren't going to use because it's expired. So that issue is no longer valid, assuming that the department does do what they say that they're going to do. I think it's a challenge to the three-drug protocol still extant in view of the fact that the Department of Corrections is now going to use the one-drug protocol. Is that claim moot at this point? Judge Rawlinson, we would argue that for the plaintiffs below, that is not a moot issue. For Mr. Mormon and Mr. Towery, who are here before you today with a preliminary injunction request, if in fact the department does use a one-drug protocol, then the three-drug protocol issue is moot. And because we're on an injunction, and as I understand it, that's only Mr. Towery and Mr. Mormon, that would preserve the three-drug, one-drug dichotomy to go forward in its normal course in the trial court. Is that correct? Yes, Your Honor. Okay. What about, are you going to address the exclusion of counsel issue? The third issue that we raised here before this Court is that the new revised protocol as of January 2012 takes away the previously allowed in-person attorney-client visits that happen usually the morning of an execution. In Arizona, they generally take place in the morning, 10 o'clock or 11 o'clock. And the protocol for the last 25 years has allowed prisoners to have in-person visits with their attorney. Now, are you aware of any case law? There's some case law in this circuit dealing generally but not in the execution context with a right to in-person consultation with an attorney. Is there anything either in this circuit or any other in the execution context where the proposal is not to preclude the consultation but to preclude in-person consultation? Is there any case law? Your Honor, I'm not aware of any specific to the issue that we have here. There's been case law related to having the prisoner have access to the counsel while the execution is happening. So while the IV lines are being inserted, in case there's an Eighth Amendment challenge that needs to be raised during that time. But I'm not aware of any other challenges. And which case is that? Is that the Ohio case? The Ohio, it was Rommel-Broom. That was an issue. And then also there was a case out of Tennessee Coe, C-O-E. And both of those involved. Was there a Seventh Circuit case that held that there was a problem with telephonic only? I'm not sure, Judge McKeown, on that one. Okay. And what is, can you, the record is, you have some declarations in the record about this, but they're not horribly clear about exactly how these visits took place in the past. I gather there were not contact visits. Correct. Speaking, what, through a opening or something? Right. There's a cage with wire mesh. I see. But so how, I mean, I guess there were two things that you said would be an issue if they were not in-person visits. One was the competency question, which I understand. The second is the notion that there would be less confidentiality. Can you elaborate on that at all? Yes, Your Honor. So when you are sitting with your client, you can get close and talk at a minimal level. There's still going to be officers, correctional officers, who are in the vicinity. And so the issue is there's no rational basis to exclude the lawyers from having access to their client in person on the morning of an execution. The protocol now says that after 9 p.m. on the eve of an execution. I understand that. But, again, first you need an injury, some kind, especially given Lewis v. Casey,  And I understand the confidence part. And it seems intuitively right that there's a difference between being there and having to talk on the telephone. But it would be helpful to know exactly why that is. Well, in part because if the client decompensates, you need to be able to actually see that person. I understand that part. I'm talking about the confidentiality issues. Well, the confidentiality issue is in connection with that because if we're only allowed to talk to our clients on the phone, and there's Department of Corrections personnel there, we don't know what can be overheard, what the client will feel comfortable saying over the phone. The phone lines are often difficult to hear anyways. So it just burdens the communication that we're able to have with our clients. And in that regard, the Department of Corrections, this new protocol has given so much discretion to the director in every other aspect except they've taken this away. And they haven't provided a legitimate, reasonable reason to remove this ability to visit with the prisoner on the last few hours of his or her life. I see that I have a little less than five minutes that I'd like to save for rebuttal unless you have any questions. You may do that. Thank you. May it please the Court. My name's Jeff Zick. I'm with the Arizona Attorney General's Office representing Appalee today. Plaintiffs below did not... May I just ask you one question? Yes. How is it possible that you didn't go into your drug supply when you issued the execution warrant and before you gave notice to find out that you had expired drugs and that we're here less than 48 hours before the execution trying to decide serious constitutional questions and you've changed the shape of the table? Well, it is unfortunate that that has occurred. What did occur, Judge McKeown, is the Department did in fact go into its chemical inventory about approximately a month ago prior to making any decision on which protocol to use under the amended protocol. Apparently what had happened was the domestically obtained pancaronium bromide was determined to be expiring in January of 2012. On the information that the Director was given with respect to the foreign-supplied pancaronium bromide, it reflected January 2013. When the Department was going through its training today, which they have been going through training for various days over the last 35 days, and went to the chemical room to again double-check the inventory, when it looked at the pancaronium bromide labels, the labels indicated that it had expired January 2012. Given that... Well, isn't this example A, that people make mistakes? And that the whole issue here is really what protections do they have to be against people making mistakes? Right? Of course there are always going to be mistakes. I mean, I don't think I can stand here and say there's never going to be a mistake. And I believe Bays recognized that in the execution context. But doesn't Bays also recognize that there therefore have to be systems when the mistake can be an Eighth Amendment violation to prevent the Eighth Amendment violation? And it seems that your current protocol, I mean, what you've been doing is cutting further and further and further back on tying your hands in any way, which it seems to me means there's more and more and more likelihood of mistakes. I disagree a little bit with what you're saying, Judge Berzon. What I would say is that there are safeguards in place, and this could be example B of that. The safeguard of checking the inventory again, not only 35 days prior, but 48 hours before, 24 hours before, ensuring that those drugs are not expired. And I can tell you that under the protocol those – But the result is you didn't give the notice you were supposed to give, and you vastly inconvenienced a whole bunch of people, at least. Well, that's true. But we did give notice immediately upon knowing what had occurred, and there has been no detriment in fact here. This protocol that the Department is now going to be using is exactly what the plaintiffs have been asking for since 2007. Can you give us any explanation at all, since you're doing it so cavalierly at the very last minute now, why there's been this huge reluctance in light of the discussion we had earlier? I mean, you're using enough of this drug anyway to complete the execution. Why has the agency – has the government insisted on then going ahead and administering other drugs? Well, I believe it's because of Arizona's history using a three-drug protocol. Arizona has had a history where there has been no evidence that an inmate has suffered pain in any of the executions where a three-drug protocol has been used. The Department is very familiar with – Well, he's certainly not going to suffer pain if he's dead. I'm sorry? He's certainly not going to suffer pain if he's dead. Well, but the standard really is, is he going to be – is he going to – is the inmate going to suffer a demonstrated risk of pain with the first drug being administered, whether there's a maladministration of the first drug? Under a one-drug protocol, the maladministration is simply the placement of the IV catheter, and whether that is going to be a – Or an ineffective drug or an insufficient amount of it. That could happen, but that's so far speculative at this point, given the fact that Arizona has used the barbiturate pentobarbital before, and it has a supply of pentobarbital to use in the pending executions. But with a three-drug protocol, the Department has been very used to using that particular protocol, and it is – there are safeguards built into this protocol when the three-drug protocol is being used. There are various consciousness checks. There is the requirement that IV team members have one year of relevant experience in placing IVs. There are backup – My understanding of what that means is that somebody who 20 years ago, you know, one day of training where he doesn't actually do any of it, and that's good enough. That could happen, but it's highly unlikely. What the history that the Department has used with respect to at least the last five executions is individual members have to have relevant experience. Now, in the West litigation – What about current – What is relevant experience? which was the standard in the prior protocol? I didn't catch that, Judge Rollinson. What about the experience being current, which was part of the prior protocol? So could you answer both questions? Mine was what is relevant experience? Judge Rollinson is also focusing on the excision of current. Okay. I'll start with the current and that being taken out, and then go to the relevant. In the West litigation, the protocol had been written that members needed to have one year of current and relevant experience. What the Department had experienced, and what the Department actually practiced, was that individual members of the IV team did not have current with respect to the last 12 months experience. They certainly had relevant experience in the fact that they had been doing – For example, there's two examples here. The IV team member, or at the time it was called medical team member, that was not the medically licensed physician, had eight years as a military corpsman placing peripheral IV lines on a daily basis or weekly basis. That is not a complicated procedure. I believe there was testimony that it's something that once you learn it and do it for a period of time, you're not going to lose that skill. With respect – so he didn't have the current – the medically licensed doctor who had been used in a prior execution had changed jobs from an emergency room physician to a clinical practitioner. Although his experience as an emergency room physician had – he had placed central lines on a regular basis. The protocol doesn't require a medical doctor to be either of these people. The protocol does not require that anybody have eight years of experience. The protocol does not require – does not say what it means to have done it for a year, and it certainly doesn't require that it be daily for a year. So my hypothetical is still true as far as the protocol goes, right? It can be true, but like I said, it's highly unlikely, given the fact that the department has always had an individual who has relevant experience, and nothing like 20 years prior without having done it for 20 years. Let me ask you, you know, one of the problems with this litigation is that it changes. And then you say, well, trust us because it all works out with the people we have. The difficulty is we have to read the words you wrote. You told the district court, and I think he wrote it into his opinion, that the relevant experience, you know, had to be – you had to have no less training than what would be required of an individual who's licensed to perform IV, I guess, insertions or procedures. And that's still your position, that this person would have no less training than that individual? That's correct. Relevant experience means training in placing IV catheters. If you think about this statistically – That would take care of the person's training, and then you argue, well, the person doesn't lose that training. It's not something where you need, you know, up-to-date medical science to do. But what if you had a year of experience in 1952? Would that be sufficient under the protocol as written? I don't believe the director or any director of this Department of Corrections would believe that would be relevant experience. The problem is, how do we know that? Relevant experience and – when you're looking at the actual language, have at least one year of relevant experience in placing peripheral IVs. That one year of relevant experience, historically, has been somewhat recent. We're not talking of 20 years. We're not talking – it could be eight years, depending on the experience the person had prior to the period of time that the person would participate in an execution. For example, the IV team member or medical team member who was not the medically licensed doctor in the West litigation had eight years of experience on a weekly basis placing peripheral IVs. Let me ask you this. Do you have a team in place for Wednesday? Yes. Without revealing the identities of those individuals, how recent was the experience of those individuals? All within 12 months. And that excludes the training that occurred today and yesterday and the days before? Yes. To talk about – there's also a challenge to the question of whether there's sufficient redundancy in this protocol. The district court understood that the protocol does require that there be a backup system. But it's striking that the new protocol, unlike the old protocol, does not require that there be any preparation of more than one set of drugs. Is that correct? That is correct. There's a preparation of one set of chemicals. So what the district court found is just wrong. There seems to be a leftover sentence from the prior system, but there's no way that you could actually administer a second set without stopping everything, going back, remixing the drugs, resetting up the syringes, resetting up the manifold, and so on. Is that right? That's incorrect. Why? There is – I believe it's ER-326 in the protocol itself. The backup chemicals are to be available. There is a backup. It says distinctly there is to be only one set available. Distinctly. One set that is available and prepared to administer. There is another set that is available in the chemical room. And if you look at the IV catheters, and this is where the challenge really, I believe plaintiffs only challenged the fact that there wasn't a backup IV catheter being placed. There is a backup IV catheter being placed in the inmate. So in the event that the first set of drugs is not – fails to be administered properly, there is a backup line where an additional set, which is available in the chemical room, can be administered. Where is it saying that? How long would that take for the backup chemicals to be administered? Well, with a one-drug protocol, it won't take that long. What does that long mean? Well, I would be speculating at how long it would actually take. If you look at the protocol, there are two syringes of pentobarbital that are given. Pentobarbital is not a drug that is mixed. It's simply taken from the vial and placed in the syringe. And then it would simply be a matter of taking those syringes, putting them on the manifold, which means screwing them on a manifold, hooking up the backup line, and then – But there aren't any syringes. I mean, unless I'm reading entirely wrong. What it says is that the one full set of syringes is used in the implementation of the death penalty and one full set is to be available, which I understand to mean there's one full set. And if you look at the chart, it used to have a chart that showed syringe 1A, syringe 2B, and syringe 1C. And now there's only A. There's no B and there's no C. And that appears to me to mean that there's not going to be any preparation of those syringes. Is that wrong? And if so, why did you change it? No, you are correct that the preparation of the syringes is not made at the time. The chemicals are available in the event that the first set fails. Let me ask you this. Since you've mostly been using the three-drug set and not the one drug, and given the notice here, would there be any practical problem with the state having the backup set, which we know is available because you've checked that and it's available in the drug room, wherever that may be, or the medical closet, would there be any practical problem with having the backup set available in syringe or ready-to-go status? There would be no practical problem with doing that, since it has been done in the past. But there must have been some reason why this was changed. I think the reason, one particular reason it was changed to have the chemicals available and not particularly put in the syringes, the second set, that is, is cost. Could you show me where it says that there's a second set available? It might take me a few minutes to find. Actually, it's on ER-326. Oh, no, I'm sorry. If you look at ER-346, it's attachment D to the… Yes, I know. Okay, in V2, it says one full set is to be… One full set of syringes is used in the implementation of the death sentences, and one full set is to be available. Where does it say there's anything else available? Well, that's what is available, the one full set. One full set, exactly. There's no other set of chemicals or anything else. Well, one full set of syringes is to be implemented. So, for example, if we're looking at the one drug protocol, five grams of pentobarbital would be available for implementation. Those would be in the syringes. And then one full set, which would be an additional five grams of pentobarbital, would be available in the chemical room in their vials, available to be used in the event the first set fails. It's certainly not how I read it. So the way you read it is one set is used in implementation, meaning the administration. Correct. And one full set is to be available. Correct. And if there was any ambiguity, you mean one additional full set. Is that what you're saying? There would be one additional full set, yes. Okay, thank you. So you'd have two sets. Okay. And that there is two IV catheters, one primary and one backup, in the inmate for the administration of these chemicals. So the primary would be the one where the first set, where the main available already in syringes set of chemicals are going into the inmate. In the event a femoral line, a central line is used, that can only be done by a medically licensed physician. So that safeguard is in there. There are also the other safeguards that the district court found did not violate the Constitution that remain in this protocol that remained in or that was in the protocol that the district court looked at in West and in this preliminary injunction below. Could you address the counsel question, please? Sure. With respect to the counsel question, we don't believe the plaintiffs are barred from any contact with their counsel. Obviously, they're getting unlimited telephonic counsel. I understand a concern about the competency issue, but given the heightened scrutiny that the director felt with respect to the identity of execution team members in Housing Unit 9, and Housing Unit 9 being a very, it's not a very large room, it's not a very large building, it's actually pretty close quarters, that he felt it was in the best interest of the department and the execution team members that he limit the in-person contact to 9 o'clock the evening before. Now, with respect to the religious advisor that the department director indicated that would be available to go in the morning of, early morning of, and have an in-person visit with the inmate, that was for the comfort of the inmate. There's nothing in the protocol that provides counsel is not, doesn't have access to courts, doesn't have access to his client. Like I said, the telephonic contact. There may be some inmates that might forego comfort for legal constitutional protection. And so, while you might view the religious advisor as a nice add-on, he or she is a single individual, presumably the counsel would be a single individual, governed by the confidentiality policy as well as restrictions on the bar license. So, I'm having some trouble understanding why a religious person could go in but not a lawyer. I believe the director indicated that he, it was for comfort reasons, suiting to the inmate. He wanted to limit the number of people coming in and out. But that, of course, completely belies his confidentiality concern, doesn't it? Well, with a number of people. He said one person can go. You can have one person within these groups of people. Right, and there's nothing in. So, it wouldn't matter if it's a minister or a lawyer. Right, and there's nothing in this protocol that impinges counsel's ability to ask the director to use his discretion in order to allow these in-person visits. Well, let me ask you something. If we were to suggest that we were having problems with this, and that for these two executions, it would be advisable for you to allow the attorneys in and confide about it afterwards, would you do it? Would I advise a director to do it or would the director do it? Yes. I'm sure the director would be open to suggestions from the court. Could you let us know that by, say, 5 o'clock this afternoon so we don't spin wheels over this? Sure. I can do that. It's just precisely the kind of thing where we have a last-minute change. We've had, you know, a somewhat thorough but very truncated situation down in the district court, and we're here under a compressed time frame. And the department, of course, is arguing that it wants to proceed. And I think you can hear from some of the questions that there are some things that would change that calculus. I can certainly contact the court after speaking with the director immediately after this argument. Thank you. And let the court know. Because another thing is, I mean, there's just a factual vacuum on this. But, I mean, there are some declarations from the petitioner. There's essentially nothing from you that explains why it's okay to have one person but not another, what the means of telephone communication is, why these confidentiality concerns are not of at least some merit. We know that there are reasons to consult. In this very case, it could well be that things are going to drag out to the morning of the execution with regard to a need to talk to counsel. And with everything else going on, there does seem to at least, you know, impressionistically to be a difference. I understand your concerns, Judge Rizzone, and I share some of those. But, again, it's probably more of a function of this truncated procedure that we're in that that kind of evidence may not have been presented. But I certainly will contact the department director and ask and inform the court. So if the court doesn't have any further questions, I will rest on our answering brief. Is there anything you want to say about the equal protection argument? I've listened to the argument. I just don't believe there's any detriment in this equal protection claim. And I did not hear anything indicating or anything from plaintiff's counsel indicating that there is, in fact. Well, I suppose there could be. I mean, here you're saying, well, there was a doctor involved in the first five executions, in the last five executions. You're not telling us whether there's going to be one next time. But suppose Terry shows up in the morning and there's no doctor and there's just two people who, and there's not even this guy who's had eight years of experience, but there is, you know, somebody who had one year of experience 20 years, two people who had one year of experience 20 years ago, and they had a couple days of training and that's it. Then, at least at the risk level, it seems like there's a detriment. And the problem is that we can't tell anything because, you know, you just have this total discretion. But there must be a showing of a substantial risk. And under your hypothetical, Judge Berzon, which I don't believe that would ever happen, there's no showing of a substantial risk of serious harm. So there can't, there isn't an Eighth Amendment violation. Well, there must be some reason why Bayes was, you know, at least in describing, well, let's put it this way. It seems to me that whatever else is true, you're outside the Bayes' safe harbor in this case, because you don't have the training, because you don't have people with any professional experience, and because you have a different form of redundancy and so on. And so we're kind of on our own in terms of demonstrating whether this is constitutional or isn't constitutional. It doesn't make it unconstitutional, but there has to be some reason to think it is constitutional. I don't believe we are out of the Bayes' safe harbor. I believe, you know, for these two pending executions, the qualifications of the I.B.T. members are met. We have no idea what they are. We have no idea what they are. There's nothing in the record. I can tell you that the I.B.T. If the Court wants to know the I.B.T. members, I think I told you that we have a, well, they have 17 years. One is a licensed nurse with 17 years' experience. The other is a medically licensed physician. So they do have. And experience within 12 months, you indicated also. That's correct. No, they have experience. I mean, reason is they're professionals. Okay. This is what they practice. You know, although this is a facial challenge, it is here on a preliminary injunction. And so we don't, we're stuck in this situation where on its face you could have a Vietnam veteran who, you know, hasn't practiced on a person for, you know, 50 years or whatever. And you're saying, no, we don't have that. But potentially you could, at least on its face. So you can understand the conundrum the Court is in, in looking at a facial challenge, but trying to look at the practicality of the injunction and your representation. So your representation, just to be clear, is that you have a nurse with 17 years' experience, a licensed physician, and experience within the 12 months putting in I.B.T.s, correct? That's correct. Okay. Any other questions from the panel? If not, I believe we have some rebuttal time for Ms. Kina. Thank you. I think Judge Garzano had asked where the backup drug was raised in our brief, and it's footnote 14, but it references the disagreement with the district court's order as it relates to the Eighth Amendment challenge. It was also raised in our complaint, paragraphs 97 through 100. There's two points here, though. One is the backup line, which she indicated is put in, that there is a backup line, and then there was some discussion about the availability of the backup drugs. So do you disagree that the protocol doesn't read in a backup line? That was our contention, that the language was vague. There were places where it said, insert catheter with a parens F site, parens F, so therefore there could be the assumption that there might only be one catheter site. With regard to the backup use of drugs, the second set, I think, judges, you hit the nail on the head, and this is the problem that the plaintiffs have raised here with this protocol, is it is unclear from the face of the protocol what exactly is going to happen. Will there be a backup set of drugs? Not sure. And with all due respect to counsel for defendants, there have been representations in the past where counsel for defendants have said, oh, the Department of Corrections is following its written protocol exactly like the one that this court approved in Dickens, and lo and behold, after five prisoners were executed and a trial was held, that's when we learned that, no, they weren't following the written protocol. In particular, there's undisputed fact that they never did background checks, never did medical license checks on the people who were hired to participate in the execution, the last five executions. So here, we're here on a preliminary injunction because, once again, the Department of Corrections has changed the protocol at the last minute after warrants of execution have issued. We're on this compressed timeframe, not because of anything that the plaintiffs here have done, and that must be a consideration that this court takes into account when deciding this equitable remedy that Mr. Mormon and Mr. Towery are asking for. And, you know, there's been representations made as to who's on the team that is going to participate in the execution. Mr. Towery and Mr. Mormon both asked the director for this information shortly after a warrant of execution was issued, and that was never raised or never answered. This is the first time that there's been any representations that there are medical personnel. Now, suppose we had wrote an opinion that said that we are ‑‑ our understanding of the circumstances of this execution are, first, that the staff people are going to be as were represented, i.e., a licensed nurse and physician with great experience doing this. Two, there are going to be backup drugs, in fact, even though it doesn't appear necessarily in the protocol that it says there is. Number three, there's going to be a single drug administration. Number four, attorneys are going to be allowed to come in as they have been in the past. Is there anything left of your case at that point? In terms of an injunction, right now, I mean, an injunction of a stay of this execution. Why should we at that point stay this execution? So you're ‑‑ you were saying that the court would direct the Department of Health? Well, we would say that this is the representations on which we are denying the injunction. And that's not true. Essentially, they're in contempt. If that doesn't happen, they're in contempt. That's happened in the past where the Council for Defendants has made representations. We'll follow the protocol. We're going to follow the protocol. They did that. This would be very different. I mean, Council's made a representation. We'll know about access to Council by as soon as possible after the argument. But each of the challenges that you've made is answered, it seems to me, if we narrowly, if the injunction were denied narrowly subject only to the department following these, this protocol that we lay out, supplementing or, I guess, defining. Which they've represented to us. They've represented, these would be the people administering the protocol. What other constitutional challenge would be left for Mr. Mooreman and Mr. Towery? Well, Judge McKeown, if I may answer, I say I'm over time. That's fine. I think the biggest problem with that is, again, that puts this Court at exactly what they said the Court should not be. They should not be micromanaging the execution. And that's what the State has argued before. So if you're telling the State that you have to do X, Y, and Z, that's problematic. We're not telling them. That is the representations upon which we are denying the injunction, and we are taking them at their word. We are not telling them what to do. We are taking them at their word as to what they said they were going to do. Well, and how would the plaintiffs know if they did make those representations that were actually true? Because the only way that plaintiffs in the past found out was because of the client. Well, the lawsuit's not going away. The lawsuit, underlying lawsuit's not going away. And you have contempt. You have contempt. There's other things. Up to now, it's been a rolling proposition. I've been on a number of these cases. And each one, as you know, rolls into the other. Whatever may be our decision with respect to Mr. Mormon, Mr. Towery, you have an underlying lawsuit with discovery and with a whole host of hearings and whatever else filed possibly that might go forward. So you will be able to find out. I mean, if they had written back to you and said precisely what they've told us in response to oral argument, you would have had to take that at face value, I presume. Correct? Correct. Okay. So, and I just want to close. Why don't you wrap up, then, if you would, please. Yeah, I just would like to say that this Court, the plaintiffs, Mormon and Towery, think that a preliminary injunction should issue staying their execution so that these are not being executed in violation of their constitutional rights. Thank you. Thank you. I'd like to thank both counsel for your briefing, your expedited briefing, for your argument today. We will await an answer from the government. Did you have one more thing to add, Mr. Zick? Judge, I just wanted to answer the Court's question. The Director will allow for these two executions, counsel visit, as he had done in the past under his discretion. Okay. Thank you for your speedy response to that question. So with that, the case just argued on preliminary injunction, Towery v. Brewer, is submitted.
judges: McKeown, Berzon, Rawlinson, Cjj